UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 FEB -2 P 12: 52

CLERK
BY _____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:24-cr-00107-1 |
| ) | |
| JASON DOUGLAS, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE
(Doc. 36)

Defendant Jason Douglas is charged in a one-count Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 1.) Defendant moves to suppress the firearm found in his vehicle on July 29, 2024, which he contends was seized pursuant to a warrantless search to which he did not voluntarily consent. (Doc. 36.) The government opposed Defendant's motion on July 14, 2025, (Doc. 48), and Defendant replied on July 28, 2025. (Doc. 54.) The government has agreed not to introduce Defendant's answers to custodial interrogation in its case-in-chief. The court has therefore DENIED AS MOOT Defendant's motion to the extent it sought to suppress Defendant's statements. (Doc. 70.) Defendant continues to challenge his consent to search as involuntary. The government contends that Defendant's consent to search was valid and that, in any event, seizure of the firearm was permissible pursuant to the automobile exception. The court held a hearing on January 8, 2026, at which time the remaining pending motion was taken under advisement.

Defendant is represented by Devin McLaughlin, Esq. The government is represented by Assistant United States Attorney David Golubock.

**I.  Factual and Procedural Background.**

On July 29, 2024, at approximately 12:48 p.m., a staff member of a shop on College Street in Burlington, Vermont, flagged down Officer Michael S. Moran, an officer with the Burlington Police Department ("BPD"), and advised him that a man had

pointed a firearm at another man on the street outside the shop. The shop staff provided Officer Moran with closed-circuit television ("CCTV") footage of the incident. The CCTV surveillance footage, timestamped at 11:51 a.m., shows a black Audi sedan pulling into a parking spot and a man (the "first man") wearing gray sweatpants, a white T-shirt, and black and white shoes getting out of the car from the driver's seat, removing a duffel bag from the back seat of the car, and setting it on top of the car's trunk. The first man then returns to the door of the driver's seat and reaches into the car as a second male (the "second man") approaches. The first man walks toward the second man and appears to be holding and racking a firearm. He points the firearm at the second man before returning it to his side. The first man pushes the second man in the chest and walks back toward the driver's side door, which he opens as the second man takes the duffel bag and walks away. The first man, believed to be Defendant, follows the second man briefly before getting back into the Audi with the firearm.

Shortly thereafter, an individual called 911 to report a man getting out of a vehicle on Main Street with a firearm and approaching another man before getting back into the vehicle and leaving the area. At approximately 12:52 p.m., a witness to the Main Street incident provided a responding police officer with a license plate number of VT KGW837, which he had written down on a piece of paper. *See* Doc. 36-7 at 0:00-0:20. He described the vehicle as a black Audi. Dispatch reported that the license plate was registered to Defendant for a black Audi A4 sedan.

At approximately 1:45 p.m., a BPD officer observed a black Audi with the partial license plate of VT KGW. He followed the vehicle in his marked police cruiser, confirmed the full license plate number of VT KGW837, and, at approximately 1:48 p.m., effected a traffic stop. The Audi pulled into a parking lot in front of the BPD police station. Three marked BPD vehicles pulled into the parking lot behind the Audi with their cruiser lights activated, blocking the Audi's exit. Several officers approached the vehicle as Defendant, who was wearing the same or similar clothing as the man depicted in the CCTV footage, exited the driver's seat of the Audi with his hands above his head. An

officer yelled, "[No audio] . . . see your hands. Burlington Police. Stop. Do not move. Stop." (Doc. 26-10 at 00:28-33.)

At least five police officers were on the scene, at least three of whom had their guns drawn. *See* Doc. 36-9 at 0:35-0:55. The officers ordered Defendant to put his hands on his head, turn around, and walk backwards. Defendant did so and knelt on the ground, at which time the officers approached and handcuffed him behind his back. The Audi was occupied by a male passenger and his infant child in a car seat in the back seat. Officers ordered the passenger to exit the vehicle and questioned him while another officer remained near the passenger window where the infant was seated.

Officer Moran and a second officer escorted Defendant to a location behind one of the police cruisers. He patted Defendant down and began questioning him. Throughout the questioning, Defendant remained handcuffed.

Officer Moran asked Defendant for his name, who owned the Audi, and whose infant was in the back seat. Without reading *Miranda* warnings to Defendant, he proceeded to question Defendant about the firearm incidents.

> Officer Moran: So, Jason, the reason that we're here today is because there was an incident involving a firearm, okay. Does that sound familiar to you at all?
>
> Defendant: Me and my brother were arguing.
>
> Officer Moran: You and your brother were arguing?
>
> Defendant: Yes.
>
> Officer Moran: What was going on with that?
>
> Defendant: Nothing. We just—we just got in an argument, dude. And that's it. We left, and that's it. I f**king went home. I picked him up. There's no problem. . . . Threats on his end were being made, but nothing, it's—we're family. We're not—it's not—nothing to where we—it's nothing. It's nothing.
>
> Officer Moran: Okay. What was the argument over?
>
> Defendant: Him not wanting—him not—he was being in a rush, wanting to get dropped off, dude, and I don't know, he was just being—kinda arguing with his girlfriend or whatever, but we started arguing, dude, and we got into an argument, dude. And it almost got into a fistfight. And it didn't. We parted f**king ways, dude.

3

>Officer Moran: Well, I'm glad it didn't turn into a fistfight.
>
>Defendant: It didn't turn into anything. Like I said, at the end of the f\*\*king day, you know what I'm saying, like, we're brothers. We do talk sh\*t; we do say stupid sh\*t to each other.

(Doc. 36-11 at 3:11-4:10.)

Officer Moran asked Defendant for his brother's name, which Defendant provided. The questioning paused momentarily while a second officer wiped sweat off Defendant's face with Defendant's shirt. Defendant and Officer Moran then had the following exchange:

>Officer Moran: So let me ask you this: Is there a firearm inside your vehicle right now?
>
>Defendant: Yes.
>
>Officer Moran: Okay. Where's that firearm located?
>
>Defendant: The door.
>
>Officer Moran: In the door?
>
>Defendant: Yeah.
>
>Officer Moran: Okay. So do you understand why we were doing what we're doing? Does that make sense to you?
>
>Defendant: [overlapping with Officer Moran speaking] Oh, no, I know. I know. Listen, I'm not—I'm not knocking you guys for taking your precaution, but like I said, there's—it's nothing there [trailing off].

*Id.* at 4:11-32. Officer Moran spent approximately two-and-a-half more minutes asking Defendant questions about the argument with his brother, including the CCTV footage showing Defendant brandishing a firearm:

>Officer Moran: So, there was—the—the part that I'm concerned about is you driving the vehicle up on College Street near Church Street. Does that sound familiar?
>
>Defendant: Yeah. That's where we were.
>
>Officer Moran: That's where you were?
>
>Defendant: That's where we were having our argument.
>
>Officer Moran: Okay. So you got out of the car and, according to the video footage that I have, it looks like there was a firearm in your hand. That's what I'm concerned about.

4

>Defendant: Huh? I ain't gonna do nothing to my brother.
>
>Officer Moran: Okay. Did you have a firearm in your hand?
>
>Defendant: That—no.
>
>Officer Moran: Okay.
>
>Defendant: That was my f**king wallet.

*Id.* at 5:28-55. Officer Moran inquired about what led to the argument with his brother.

Officer Moran then asked, "So in terms of that firearm inside the vehicle, would you be willing to give us consent to go inside and grab that firearm?" *Id.* at 7:03-7:12. Defendant answered, "Sure, I guess. Why not? Either way, 'cause if not, you're going to get a warrant and take it, so." *Id.* at 7:13-7:17.

The second officer walked Defendant to the back seat of the police cruiser and Defendant sat in the back seat, still handcuffed. Officer Moran's body camera footage, no longer recording audio, shows him speaking to other officers for several minutes before returning to the police cruiser where Defendant was sitting in the back seat, at which point his body camera resumed recording audio. At the court's hearing, Officer Moran testified that he was seeking guidance regarding whether Defendant's consent was lawful.

Thereafter, Defendant said something inaudible to Officer Moran and they had a brief conversation, during which Officer Moran advised Defendant that he was under arrest for reckless endangerment, a misdemeanor charge, that officers would try to bring him to court that day before it closed, and that they would seize and search Defendant's car. Defendant's response is not entirely audible, although he can be heard saying at one point, "You're only doing your job. So, like, I'm not upset. You know what I'm saying? I'm more—I guess I'm upset that I got into it with my brother and got a f**king misdemeanor out of it." *Id.* at 15:20-30.

Officer Moran escorted Defendant from the BPD parking lot to the BPD police station. At approximately 4:00 p.m., Officer Moran met with Defendant in an interview room where Defendant sat without handcuffs at a table across from Officer Moran. The door to the interview room was open. Officer Moran began reading Defendant his *Miranda* warnings. When he asked, "Do you want to be represented by a lawyer or have

5

one present with you during questioning?" Defendant responded, "Yes." (Doc. 36-13 at 3:59-4:05.) Officer Moran said, "You do want to have a lawyer?" and Defendant responded, "I mean, yeah. I mean, there's no questioning, but you are supposed to say yes." *Id.* at 4:07-09. Officer Moran then said, "Okay. So if that's the case, um," and began standing up. *Id.* at 4:15-17. Before Officer Moran stood up completely, Defendant began speaking and Officer Moran sat back down. They had the following exchange:

> Defendant: I mean, I'm not—I mean, there's not no questions. It's a misdemeanor charge, you [unintelligible].
>
> Officer Moran: Yeah. Yeah, yeah, yeah. So—
>
> Defendant: I could stop it at any time I say I want a lawyer.
>
> Officer Moran: Yeah, exactly. It sounds like you understand that. So—so when I say do you want to be represented by a lawyer or have one present with you during questioning—

*Id.* at 4:15-36.

Voices could be heard from the hallway, and Officer Moran stood up to close the door. Officer Moran returned to the table and said, "Sorry about that." *Id.* at 4:34-36. Defendant said, unprompted, "So I would probably have to put no there, no, that I don't need it, but if I do want it [unintelligible]." *Id.* at 4:40-45. Officer Moran continued to ask Defendant if he wanted a lawyer:

> Officer Moran: If you do want it, yeah, you can stop at any time.
>
> Defendant: [Unintelligible] so, yeah, I understand that.
>
> Officer Moran: Okay. So does that change your answer from a yes to a no, or do you still want to have a lawyer present?
>
> Defendant: [Unintelligible].
>
> Officer Moran: Okay. So then if I ask this again—do you want to be represented by a lawyer and have one present with you during questioning?
>
> Defendant: That's what I'm saying. If I say no and, like, I change and say yes—
>
> Officer Moran: Then it stops and we're done right there.
>
> Defendant: Right. That's what I said, so, yeah, it doesn't matter. . . . I don't care.
>
> Officer Moran: Okay.

6

> Defendant: I know my rights.
>
> Officer Moran: Okay. So then just so I have all this. Um, I just need you to read this for me and then sign there and date there.

(Doc. 36-13 at 4:45-5:29.)

Officer Moran handed Defendant a form, which Defendant read out loud, "I am waiving my right to be represented by a lawyer." Officer Moran stated, "Yes. So as it stands right now, the way that this reads, you are waiving your right. If at any point you do want a lawyer, you can stop questioning or anything like that and you can ask for a lawyer." *Id.* at 5:40-53. Defendant then signed the form.

Officer Moran next read a consent to search form to Defendant and explained that Defendant could either give his consent for the vehicle to be searched or the vehicle would be seized and Officer Moran would apply for a search warrant. The consent form stated the following, with lines for signatures and dates below:

> I, Officer [] Moran[,] have probable cause to seize Audi A4 with VT Reg KGW837 here under my control. I may apply for a search warrant from a judge. You may choose to allow a search without a warrant, or you may require that I apply for a search warrant from a judge. The choice is yours.
>
> I freely give my permission to Officer Moran [] to conduct a complete search of the items listed above and their contents. I understand I do not have to allow this. No threats or promises have been made to force this consent.

(Doc. 48-2.) Defendant signed the form, and Officer Moran later found a firearm in the door panel of the driver's side of the Audi. Officer Moran did not obtain a search warrant.

Because the government has confirmed that it does not intend to use Defendant's statements as part of its direct case-in-chief at trial, Defendant's motion to suppress is limited to the suppression of physical evidence.

## II. Conclusions of Law and Analysis.

### A. Whether the Automobile Exception Applies to the Search of the Audi.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Searches conducted outside the judicial process, without prior

7

approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted). "One such exception is the 'automobile exception.'" *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010).

"Under the 'automobile exception' to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *Soukaneh v. Andrzejewski*, 112 F.4th 107, 127 (2d Cir. 2024) (internal quotation marks omitted) (quoting *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004)). The exception extends to "containers within [the vehicle] where [the police] have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991).

> The Second Circuit has explained that:
>
> [T]he mobility rationale articulated in *Carroll* [*v. United States*, 267 U.S. 132 (1925)] does not turn on case-by-case determinations by agents in the field regarding either the probability that a vehicle could be mobilized or the speed with which movement could be achieved. Rather, "whether a vehicle is 'readily mobile' within the meaning of the automobile exception has more to do with *the inherent mobility of the vehicle* than with the potential for the vehicle to be moved from the jurisdiction, thereby precluding a search." [*United States v.*] *Howard*, 489 F.3d [484,] 493 [(2d Cir. 2007)].

*Navas*, 597 F.3d at 498 (alteration adopted) (emphasis in original). The Supreme Court has held that "if the police have probable cause to justify a warrantless seizure of an automobile on a public roadway, they may conduct either an immediate or a delayed search of the vehicle." *Acevedo*, 500 U.S. at 570. The fact that the Audi was parked and subject to law enforcement's control and Defendant was in police custody at the time of the search is therefore irrelevant. *Id.*; *see also United States v. Johns*, 469 U.S. 478, 484 (1985) ("A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent

8

circumstances to justify such a warrantless search.") (citation omitted). The automobile exception thus applies if there was probable cause to search the Audi for the firearm.

The Supreme Court has characterized probable cause as "a fluid concept" that is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). The inquiry "turns on an 'assessment of probabilities' and inferences, not on proof of specific criminal conduct beyond a reasonable doubt or even by a preponderance of the evidence." *United States v. Martin*, 426 F.3d 68, 76 (2d Cir. 2005) (quoting *Gates*, 462 U.S. at 235). However, "probable cause demands more than a 'mere suspicion' of wrongdoing," *Ganek v. Leibowitz*, 874 F.3d 73, 83 (2d Cir. 2017), and is instead "demonstrated where the totality of the circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (internal quotation marks and citation omitted).

Defendant contends that the "hour [that] elapsed between when [he] was allegedly seen with a firearm and when law enforcement arrested him and searched his vehicle" negates a finding of probable cause. (Doc. 54 at 1-2.) He argues that during that hour, law enforcement was unaware of his or the Audi's whereabouts, and that an hour is sufficient to dispose of a small firearm. Defendant also notes that the firearm was seen on his person, not in the Audi itself, and there were other passengers in the Audi when it was stopped. None of these facts dispel the existence of probable cause.

The BPD received two reports of a man wearing the same or similar clothing as Defendant pointing a firearm at another person after exiting a vehicle that generally matched the description of the Audi. CCTV surveillance footage documented one of these reports. Within an hour, law enforcement located a black Audi with a matching license plate number and determined it was registered to Defendant. The traffic stop occurred near the locations where Defendant had allegedly twice brandished a firearm. The minimal passage of time did not obviate the "fair probability that contraband or evidence of a crime [would] be found in" the Audi. *Clark*, 638 F.3d at 94 (internal quotation marks and citation omitted). Nor does the possibility that evidence may have been discarded

9

negate a finding of probable cause. There is almost always the possibility that evidence can be destroyed or removed, however, it remained reasonable to believe Defendant retained possession of the firearm because less than an hour later he was still traveling in the black Audi where the firearm was last seen when he was apprehended.

Based upon the totality of the circumstances, when law enforcement effected a traffic stop and seized the firearm, there remained a reasonable and fair probability that the firearm Defendant allegedly brandished would be located in the Audi. The automobile exception therefore applies, and Officer Moran did not need a search warrant to search the Audi for a firearm. Defendant's motion to suppress on the grounds that police improperly searched his vehicle without a warrant is therefore DENIED. For this reason, the court need not and does not address whether Defendant provided valid consent to search the Audi.

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motion to suppress physical evidence. (Doc. 36.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 2nd day of February, 2026.

Christina Reiss, Chief Judge
United States District Court